**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| NATIONAL ELECTRICAL BENEFIT FUND, | : : : : | |
| Plaintiff, | : : | Civil Action No. 06-1446 (JAG) |
| v. | : : : | **OPINION** |
| STARKO ELECTRIC SERVICES, INC., et al., | : : : | |
| Defendants. | : : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on the motion for summary judgment by plaintiff National Electrical Benefit Fund ("Plaintiff" or the "NEBF") and the cross-motion for summary judgment by defendants Star Lo Electric, Inc. ("Star Lo") and StarKo Electric Services, Inc. ("StarKo," and, collectively with Star Lo, the "Defendants"), pursuant to FED. R. CIV. P. 56. For the reasons set forth below, Plaintiff's summary judgment motion shall be granted, and Defendants' cross-motion for summary judgment shall be denied.

**I. FACTS**

The NEBF is a multiemployer employee pension benefit plan within the meaning of Section 3(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(2). NEBF was established pursuant to an agreement entered into between the International Brotherhood of Electrical Workers and the National Electrical Contractors Association. (Pl.

Statement of Undisputed Material Facts ("Pl. SUF") ¶ 1; Def.'s Counter Statement of Undisputed Material Facts ("Def. Reply SUF") ¶ 1.)  Star Lo is an electrical contractor located in Whippany, New Jersey, which performs work throughout New Jersey and Pennsylvania.  (Def. Statement of Undisputed Material Facts ("Def. SUF") ¶ 1; Pl. Response to Def.'s Statement of Undisputed Material Facts ("Pl. Reply SUF") ¶ 1.)  StarKo, an affiliate of Star Lo, is also an electrical contractor, specializing in construction and line work.  (Def. SUF ¶ 2; Pl. Reply SUF ¶ 2.)

Defendants are signatories to labor agreements with IBEW Local Unions No. 102, 164, 269, 456, and 400 (collectively, the "Labor Agreements").  (Pl. SUF ¶  5; Def. Reply SUF ¶ 5.)  The Labor Agreements do not require the employer to pay vacation pay, sick pay, or personal days, or to grant vacations, personal days, or sick days to covered employees.  (Def. SUF ¶ 6; Pl. Reply SUF ¶ 6.)

The Labor Agreements also state that the employer is bound by the terms in the Restated Employees Benefit Agreement and Trust of The National Electrical Benefit Fund (the "Trust Agreement").  (Pl. SUF ¶ 7; Def. Reply SUF ¶ 7.)  Section 6.1 of the Trust Agreement states:

> **Section 6.1  Covered Employer Contributions.**  Each Covered Employer shall pay by the fifteenth day of each calendar month (except as provided herein) to the NEBF's designated local collection agent an amount equal to 3% of the gross labor payroll for the preceding calendar month paid to, or accrued by, the Covered Employees, as described in this Article. . . .

(Trust Agreement, attached as Ex. 3 to Certif. of Joseph Barchetto ("Barchetto Certif.").)  The Trust Agreement goes on to explain in Section 6.2.1 that the term "3% of the gross labor payroll" shall mean:

> **6.2.1**  as to Covered Employees who are in a bargaining unit represented by the Brotherhood or Local Union, 3% of all

2

> wages and other compensation paid to, or accrued by, the
> Covered Employees in the Brotherhood bargaining unit or
> the Local Union bargaining unit for services performed for
> the Covered Employer . . . .

(Id.)  The Trust Agreement states in Section 6.2.3 that

> the term "wages and other compensation" shall exclude: the value
> of non-cash fringe benefits; bona fide contributions made by the
> Covered Employer to: (a) a trust fund establishing under § 302(c)
> of the Taft-Hartley Act, or (b) a separate entity or fund which
> provides retirement benefits or medical benefits; and, bona fide
> bonuses of an extraordinary nature (i.e., lump sum year-end
> bonuses, not ordinarily paid as part of a regular payroll period).

(Id.)

      For many years, Defendants contributed to the NEBF.  (Def. SUF ¶ 24; Pl. Reply SUF ¶ 24.)  During those years, Defendants did not pay contributions based on holiday pay, vacation pay, bonuses, or other non-productive wages.  (Id.)

      In 2007, an auditing firm performed payroll compliance reviews of Defendants' books and records.  (Pl. SUF ¶ 10; Def. Reply SUF ¶ 10; Def. SUF ¶ 36.)  Star Lo's audit covered the period running from January 2002 to March 2007.  (Def. SUF ¶ 36, Pl. Reply SUF ¶ 36.)  StarKo's audit covered the period running from January 2004 through March 2007.  (Id.)

      For the years 2002 through 2003, the auditors found that Star Lo had a deficiency in its contributions totaling $18,957.58.  (Def. SUF ¶ 41; Pl. Reply SUF ¶ 41.)  For the years 2004 through March 2007, the auditors found that StarKo had a deficiency in its contributions that amounted to $10,666.32.  (Def. SUF ¶ 40; Pl. Reply SUF ¶ 40.)[1]

---

[1] The parties presented conflicting information regarding the amount of delinquent contributions made by Defendants, according to the audit reports.  Both parties agree that, according to the audit, StarKo owes the NEBF $10,666.32 in delinquent contributions.  (Pl. SUF ¶ 13; Def. Reply SUF ¶ 40.)  However, Plaintiff interprets the audits as stating that Star Lo owes

3

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Cascara v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ." Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . . that would entitle [them] to a directed verdict if not controverted at trial.'" In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it . . . must show that, on

---

$46,742.15 to the NEBF.  (Pl. SUF ¶ 11.)  In contrast, Defendants state that the auditors found Star Lo's alleged deficiency to amount to $18,957.58 for the years 2002 through 2003, and $29,158.15 for the period running from 2004 through March 2007, totaling $48,115.73. (Def. SUF. ¶¶ 39, 41.)

all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original) (internal citations omitted).) Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). "If the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented." Foster v. Morris, 208 F. App'x 174, 179 (3d Cir. 2006).

### III. ANALYSIS

The principal question at issue in the parties' summary judgment motions is whether vacation and holiday pay constitute a part of the "gross labor payroll," and therefore should be taken into account when calculating the amount of contributions owed by Defendants to Plaintiff. Defendants argue that holiday and vacation pay granted to some employees should not be included in the calculus to determine the amount of contributions due. In contrast, Plaintiff argues that the terms of the Trust Agreement require contributions based on wages and other compensation, including those paid for holiday and vacation time.

5

Federal law governs the interpretation of terms in collective bargaining agreements and trust agreements.  See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957); Franchise Tax Bd. Of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 26 (1983).  "The determination of whether a contract term is clear or ambiguous is a pure question of law . . . ."  Teamsters Industrial Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993).

"It is the role of the court to interpret a written contract when 'the terms and surrounding circumstances are unambiguous.'"  Pension Fund for Nursing Homes and Health Care Employees-Phila. and Vicinity v. Resthaven Nursing Ctr., No. 07-0313, 2008 WL 2132097, at *3 (E.D. Pa. May 20, 2008) (citing Sheet Metal Workers Local 19 v. Keystone Heating & Air Conditioning, 934 F.2d 35, 41 (3d Cir. 1991)).  To determine whether a contract term is ambiguous, courts look to "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Resthaven Nursing, 2008 WL 2132097, at *3.  Courts examine the proffer of the parties, as well as objective indicia, to determine whether a contract is capable of more than one construction. Id. at 4.

This Court concludes that the term "gross labor payroll" is not ambiguous, and is clearly defined by the Trust Agreement in a manner so as to include holiday and vacation pay.[2]  The

---

[2] Defendants attempt to use ancillary language in two of the Labor Agreements to argue that "gross labor payroll" means wages paid for actual work.  (Def. Br. 3-4.)  This argument fails for two reasons.  First, Defendants dispute Plaintiff's assertion that the terms in the Labor Agreements are identical, such that the interpretation of one could be inferred to apply to the others.  (Pl. SUF 5; Def. Reply SUF 3.)  Second, Defendants rely on language used to describe its required contributions to different funds, such as the Administrative Maintenance Fund, to explain the form of contributions it owes to the NEBF.  The terms of the contributions negotiated

Trust Agreement states that all Covered Employers (which includes Defendants) must contribute to the NEBF "3% of the gross labor payroll." The phrase "3% of the gross labor payroll" is defined in the Trust Agreement, in relevant part, as "all wages and other compensation paid to, or accrued by, the Covered Employees . . . for services performed for the Covered Employer . . . ."

The parties emphasize different parts of this definition in order to argue their respective positions. However, Plaintiff's explanation proves more persuasive. Plaintiff highlights the phrase "wages and other compensation" in the definition of "3% of the gross annual payroll." Plaintiff then points to Section 6.2.3 of the Trust Agreement, which explicitly names three forms of compensation that do not constitute "wages and compensation": 1) non-cash fringe benefits; 2) contributions to other trust funds; and 3) extraordinary bonuses, such as lump-sum year-end bonuses, not ordinarily paid as part of a regular payroll period. The structure of this definition indicates that the parties intended for all other forms of remuneration to constitute "wages and other compensation." Had the parties intended for vacation and holiday pay to be exempt from the definition of "wages and other compensation," they would have expressly stated this intention in Section 6.2.3 of the Trust Agreement.

Furthermore, vacation and holiday pay do not fit under the ambit of any of the aforementioned categories excluded from the scope of the term "wages and other compensation." Defendants argue that vacation and holiday pay are "fringe benefits" that are expressly excluded from the definition of "wages and compensation." Although courts have held that fringe benefits include vacation pay, the language at issue in the Trust Agreement references "*non-cash* fringe

---

and agreed upon by Defendants and other funds do not shed light on the meaning of the terms negotiated and agreed upon by Plaintiff and Defendants. Instead, the Trust Agreement serves as the contract that sets forth, in clear language, the meaning of the term "gross labor payroll."

benefits." Defendants conveniently ignore the qualifier, which implicitly incorporates *cash* fringe benefits, such as vacation and holiday pay, into the definition of "wages and compensation."

Defendants stress that the definition of "3% of the gross labor payroll" includes wages and other compensation "*for services performed* for the Covered Employer." (Def. Br. 5 (emphasis in original).) Defendants then present three unconvincing arguments to support their theory that holiday pay and vacation pay are not compensation for services performed.

First, Defendants rely on the definitions of "perform" and "service" set forth in Webster's New Universal Unabridged Dictionary. (Def. Br. 5.) However, vacation and holiday pay are forms of compensation that would only be received by employees performing services for Defendants. The plain meaning of "perform" and "service" do not clarify the interpretation of the phrase "3% of the gross labor payroll."

Second, Defendants emphasize that their course of conduct with Plaintiff explains the meaning of the term "gross labor payroll," as they have never submitted contributions to the NEBF based on vacation and holiday remuneration.[3] To support this argument, Defendant rely on the Third Circuit's decision in Rolls-Royce, in which the court held that the employer's longstanding practice of providing contributions for only regular employees impaired the welfare and pension funds from claiming entitlement to contributions based on probationary employees.

---

[3] Defendants also ask this Court to take into consideration the certifications of five electrical contractors that contribute to the NEBF, in accordance with the terms of the labor agreements and trust agreements governing them. (Def. SUF 27-32.) Notwithstanding the fact that the certifications present factual information that the parties dispute, Defendants failed to present any evidence showing that these five electrical contractors make up a predominant portion of the industry. This Court shall only analyze the past actions of Defendants when examining the parties' course of conduct.

989 F.2d at 137; see also Resthaven Nursing Ctr., 2008 WL 2132097, at *7 (stating that "[t]he past dealings of contracting parties pursuant to an agreement are probative of the parties' intent," and that "[e]vidence of a course of conduct is particularly compelling when it occurs over a substantial time period"). However, Defendant fails to take into account that, in Rolls Royce, the Third Circuit noted that the welfare and pension funds were aware of the employer's failure to contribute for probationary employees, but yet never raised this issue at collective bargaining negotiations. Id. at 134. Although Defendants declare that, for years, they declined to include vacation and holiday pay into the calculations used to determine their NEBF contributions, they have set forth no evidence showing that Plaintiff was undisputably aware of this omission.

Last, Defendants argue, unsuccessfully, that Plaintiff waived its right to recover the $18,957.58 in deficiencies allegedly owed by Star Lo for the period from 2002 through 2003 because Plaintiff refused to accept a check for $18,957.58 offered by Star Lo to resolve the pending lawsuit in June of 2007. "Accord and satisfaction is an affirmative defense"; it is a "method of discharging and terminating an existing right and constitutes a perfect defense in an action for enforcement of the previous claim." ABB Daimler-Benz Transp.(North America), Inc. v. Nat'l R.R. Passenger Corp., 14 F. Supp. 2d 75, 93 (D.D.C. 1998) (citing 6 Arthur L. Corbin, CORBIN ON CONTRACTS § 1276 (1962)). "An accord and satisfaction is a substitute contract for settlement of a [claim] by some alternative other than full [performance]."[4] Paramount Aviation

---

[4] The doctrine of accord and satisfaction may be applicable in disputes governed by ERISA. See Gorini v. AMP Inc., 94 F. App'x 913, 922 (3d Cir. 2004) (indicating the doctrine of accord and satisfaction applies in determining whether severance obligations under an ERISA plan were satisfied); LaBarbera v. A. Morrison Trucking, Inc., 197 F. App'x 18, 20 (2d Cir. 2006) (indicating that accord and satisfaction may bar recovery of deficiencies owed to trust funds by employers under an ERISA plan or agreement); Ries v. Humana Health Plan, Inc., No. 94-6180, 1995 WL 669583, at *6 (N.D. Ill. Nov. 8, 1995) (finding that the doctrine of accord and

Corp. v. Agusta, 178 F.3d 132, 147-48 (3d Cir. 1999) (citing Occidental Chem. Corp. v. Environmental Liners, Inc., 859 F. Supp. 791 (E.D. Pa. 1994)).

"[A]ccord and satisfaction requires both a contract, known as the accord, and performance of that contract, known as the satisfaction." ABB Daimler-Benz, 14 F. Supp. 2d at 93 (citing CORBIN ON CONTRACTS § 1276). "It is the universal rule in this country . . . that an accord and satisfaction arises only where both parties intend the payment to terminate a then existing controversy." Louis Schlesinger Co. v. Kresge Found., 388 F.2d 208, 210 (3d Cir. 1968). If, as Defendants state, Plaintiff did not accept Star Lo's check for $18,957.58, then the parties cannot have agreed to terminate this controversy. Since an accord was not created by the parties' conduct, Plaintiff is not barred from pursuing its claims against Defendants.

This Court is convinced from the language of the Trust Agreement that "3% of the gross labor payroll" includes vacation and holiday pay awarded to employees. Judgment shall be entered in favor of Plaintiff.

---

satisfaction applies to ERISA claims). But see Kauffman v. Sedalia Med. Ctr., Inc. Profit Sharing Plan & Trust, No. 04-543, 2006 WL 783461, at *10 (S.D. Ohio Mar. 27, 2006) ("application of the defense of accord and satisfaction is inappropriate in this case as it runs contrary to the nonforfeiture provisions of ERISA, 29 U.S.C. § 1053, and the public policy of the statute").

## IV.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for summary judgment shall be granted, and Defendants' cross-motion for summary judgment shall be denied.


       S/Joseph A. Greenaway, Jr.
       JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date: June 30, 2008